UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                              :
MAIN MARKET PARTNERS, LLC,                    :
                                              :     CASE NO. 1:18-CV-916
        Plaintiff,                            :
                                              :
vs.                                           :     OPINION & ORDER
                                              :     [Resolving Docs. 37, 40, 41]
OLON RICERCA BIOSCIENCE LLC,                  :
                                              :
        Defendant.                            :
                                              :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this suit, the parties each make contractual claims coming from Plaintiff's 2017 sale of its chemical research business to Defendant. Plaintiff now moves for partial summary judgment,[1] and Defendant also moves for partial summary judgment.[2] Plaintiff also moves to strike portions of two declarations Defendant uses to support of Defendant's summary judgment.[3]

For the reasons stated below, the Court **DENIES** Plaintiff's motion for partial summary judgment and **DENIES** Defendant's motion for partial summary judgment. The Court also **DENIES** Plaintiff's motion to strike.

## I. Background

Plaintiff Main Market Partners ("Main Market") is an Ohio LLC. Through subsidiaries, it owned and operated a chemical division that chiefly sold research and

---

[1] Doc. 40. Defendant opposes. Doc. 45. Plaintiff replies. Doc. 52.
[2] Doc. 37. Plaintiff opposes. Doc. 49. Defendant replies. Doc. 53.
[3] Doc. 41. Defendant opposes. Doc. 43. Plaintiff replies. Doc. 51.

development services to biotech, pharmaceutical, food, flavor, fragrance and specialty chemical customers.

Starting in 2016, Plaintiff put this chemical division up for sale.[4] In February 2017, Plaintiff sold the chemical division sale to Defendant Olon Ricerca Bioscience LLC ("Olon") for $27 million. Olon is a wholly-owned subsidiary of Italian chemicals firm Olon SpA. A heavily-negotiated asset purchase agreement ("Purchase Agreement") controlled the sale. The sale closed in June 2017.

In the Purchase Agreement, Defendant Olon agreed to pay Plaintiff $5.5 million (the "earn-out payment") if the chemical division met an earnings target[5] in the first post-sale year.[6] Olon also promised to refrain from taking any bad-faith actions to avoid the earn-out payment.[7]

The chemical division did not meet the earnings target that would have required Olon to pay the earn-out payment. Believing that Defendant had purposefully operated the business to dodge the earnings target, Plaintiff brought this lawsuit.

Olon also came to regret the purchase. Disappointed with the chemical division's performance, it counter-claims that Plaintiff Main Market fraudulently understated its costs in the financial disclosures that led to its purchase.[8]

Defendant Olon also sues after a contract dispute with a legacy customer. Shortly after the sale, Esperion Therapeutics ("Esperion"), rejected a batch of allegedly

---

[4] Doc. 1 at 7.
[5] That is, if the "12 Month Adjusted EBITDA" (as defined in the Purchase Agreement) met or exceeded $3.4 million. *See* Doc. 39-1 at 7.
[6] Doc. 39-1 at 22.
[7] *Id.* at 23.
[8] Doc. 19 at 16.

contaminated chemicals that Plaintiff Main Market shipped to Esperion before Main Market sold the chemical business to Olon. Defendant Olon ultimately settled Esperion's claim for several million dollars and here claims that Plaintiff must indemnify this loss.[9]

Both sides now move for partial summary judgment.

## II. Discussion

Summary judgment should be given where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled judgment as a matter of law."[10] A genuine dispute of material fact exists if a reasonable factfinder could return a verdict for the non-moving party. The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmovant.[11]

The Purchase Agreement stipulates that Delaware law governs all issues arising from the contract.[12] Thus, the Court applies Delaware law.[13]

### A. Plaintiff's Claims

i) <u>The Court Denies Defendant's Motion for Summary Judgment on Plaintiff's Section 3.4(f) Bad-Faith Breach-of-Contract Claim</u>

Plaintiff claims that that Defendant deliberately depressed the chemical division's earnings to avoid paying the earn-out payment, breaching the Purchase Agreement section 3.4(f). Defendant moves for summary judgment on this claim.

---

[9] *Id.* at 19.
[10] Fed. R. Civ. P. 56(a).
[11] *See Scott v. Harris*, 550 U.S. 372, 378 (2007).
[12] Doc. 39-1 at 50.
[13] *See Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001) ("In determining which states' law applies, our analysis is governed by the choice of law principles derived from federal common law."). Federal courts apply *Restatement of Conflict of Laws 2d* § 187 to determine whether the parties' choice of forum governs. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 924 (6th Cir. 2006). Under § 187, the parties' agreed choice of law governs their contractual rights and duties absent certain exceptions not applicable here.

> Section 3.4(f) provides that:
>
> [s]ubject to the terms of this Agreement and the other Ancillary Agreements, subsequent to the Closing, Buyer shall have sole discretion with regard to all matters relating to the operation of the Business; *provided, that Buyer shall not, directly or indirectly, take any actions in bad faith that* would have the purpose of avoiding or reducing any of the Earn-out Payments hereunder.[14]

Plaintiff claims that Defendant Olon violated this provision by, *inter alia*: 1) pushing out lucrative sales to its corporate parent until after the earn-out period;[15] 2) foregoing contractual payments owed by Esperion, a chemical division customer;[16] 3) incurring $3 million in unreasonable strategic costs during the earn-out period;[17] 4) failing to contemporaneously track and account for strategic costs;[18] and 5) obscuring and concealing strategic costs.[19]

The parties devote much of their briefing to disagreement over the proper Delaware-law standard for contractual bad faith claims.[20] Both parties propose incorrect standards.

---

[14] Doc. 37-1 at 23.
[15] Doc. 49-4 at 31.
[16] Doc. 49-1 at 23.
[17] *Id.* at 20.
[18] *Id.* at 22.
[19] *Id.*
[20] Contractual bad-faith claims are distinct from claims alleging breach of the implied covenant of good faith and fair dealing. When the contract explicitly addresses issues of good or bad faith, the implied covenant does not apply. *See Stewart v. BF Bolthouse Holdco, LLC*, No. CV 8119-VCP, 2013 WL 5210220, at *15 (Del. Ch. Aug. 30, 2013) ("When an issue is addressed by the express terms of the contract, those express terms always supersede, and cannot be overridden by, the implied covenant." (internal quotation marks omitted)).

Case N0. 1:18-cv-916
Gwin, J.

Defendant's proposal relies[21] upon a Delaware Supreme Court case that was subsequently overruled.[22] Plaintiff's proposal[23] articulates a *pleading* standard that does not seem to apply to summary judgment.[24]

The Delaware Chancery Court's decision in *LaPoint v. AmerisourceBergen Corp* is instructive.[25] Interpreting a nearly identical earn-out provision[26] in the context of a summary judgment motion, the Chancery Court held that the seller could prove breach by showing that the buyer "shut down an otherwise advantageous deal in order to prevent [sellers] . . . from receiving merger consideration."[27] At the subsequent bench trial, the court held that the seller could have proved this by "demonstrat[ing] that [the buyer] stifled otherwise profitable merger negotiations . . . simply in order to avoid earnout payments."[28]

Thus, to succeed on this claim, Main Market must show that Olon took unprofitable actions (or forewent profitable opportunities) to avoid paying the earn-out payment. Main Market does not need to prove that avoiding the earn-out was Defendant's *sole* purpose.[29]

---

[21] Defendants cite to *Indus. Opportunity Partners, L.P. v. Kendrion FAS Controls Holding GmbH*, No. 13-CV-6622, 2015 WL 196339 (N.D. Ill. Jan. 14, 2015) for its standard. However, *Industrial Opportunity Partners*, cites to *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101, 110 (Del. 2013), which relies upon the overruled case.
[22] *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 260 (Del. 2017), *overruling Brinckerhoff v. Enbridge Energy Co., Inc.*, 67 A.3d 369 (Del. 2013).
[23] *See Clean Harbors, Inc. v. Safety-Kleen, Inc.*, No. CIV.A. 6117-VCP, 2011 WL 6793718, at *7 (Del. Ch. Dec. 9, 2011).
[24] *Id.* at *7 (noting that its pleading standard is merely designed "to give the defendant notice of the claim being made against it").
[25] No. CIV.A. 327-CC, 2007 WL 1309398 (Del. Ch. May 1, 2007), *aff'd*, 956 A.2d 642 (Del. 2008).
[26] The provision required the buyer to "act in good faith during the Earnout Period and will not undertake any actions during the Earnout Period any purpose of which is to impede the ability of [the seller] to earn the Earnout Payments." *Id.*
[27] *Id.* at *10.
[28] *Id.*
[29] *See Lazard Tech. Partners, LLC v. Qinetiq N. Am. Operations LLC*, 114 A.3d 193, 195 (Del. 2015) (party could prevail by showing that counterparty's actions were motivated "at least in part" by desire to avoid earn-out payment).

Because there is a material fact dispute regarding Defendant's motives, the Court denies its motion for summary judgment.

For example, Defendant gave chemical division customer Esperion a $2.25 million credit and forewent thousands of dollars in contractual payments during the earn-out period after a dispute about allegedly contaminated products.[30] Record evidence suggests that Defendant could have contested Esperion's contamination claim or reprocessed the disputed products at a low cost.[31]

Instead, Defendant Olon and its corporate parent drafted Esperion's letter rejecting the shipment.[32] Further, Esperion received a $2.5 million settlement credit that was designated as a down payment on a large new Esperion order from Defendant Olon's corporate parent.[33] When viewed in a light most favorable to Plaintiff, these facts suggest Defendant may have deliberately accepted Esperion's claim to divert business to its corporate parent and depress the chemical division's earnings. This is enough to defeat summary judgment on this claim.[34]

ii) The Court Denies Plaintiff's Motion for Summary Judgment on its Purchase Agreement Section 3.4(e) Claim

Plaintiff claims that Defendant breached Purchase Agreement Section 3.4(e), and asks for summary judgment on this claim.

---

[30] Doc. 39-1 at 22.
[31] *See* Doc. 39-2 at 50 (internal testing memo suggesting that the alleged contamination was well within tolerances and proposing a reprocessing plan).
[32] *See Id.* at 93.
[33] *See Id.* (email from Olon SpA stating that "[t]his amount (US $2,250,000) will correspond to the first milestone payment of your new order at OLON SpA in substitution of the campaign cancelled at [Defendant]").
[34] *See Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 218 (6th Cir. 2011) (explaining that matters of intent rarely lend themselves to summary disposition, and circumstantial evidence of intent is sufficient to survive summary judgment).

This section required Defendant to provide a balance sheet, income statement, and cumulative 12-month adjusted EBITDA (Earnings Before Interest, Tax, Depreciation and Amortization) calculation within thirty days each calendar month during the earn-out period.[35]

Defendant Olon admits that it did not provide the monthly adjusted EBITDA calculation during the earn-out period.[36] However, it argues that summary judgment should be denied because Plaintiff Main Market has not shown damages.

Whether or not Defendant's admitted nonperformance injured Plaintiff is a factual question to be resolved at trial. For this reason, the Court denies Plaintiff's motion for summary judgment on this claim.[37]

### B. The Court Denies Summary Judgment on Defendant's Purchase Agreement Section 4.5 Breach-of-Representation Claims

As part of the chemical division sale, Plaintiff made certain financial representations in Purchase Agreement section 4.5. Defendant claims that three such representations were inaccurate. These claims all concern how Plaintiff allocated certain company-wide expenses to the chemical division. Defendant Olon moves for summary judgment on this claim.

Because Plaintiff Main Market operated several other business divisions separate from the purchased chemical division, it had some companywide administrative costs—primarily, salary and benefits for sixteen employees working in human resources, finance

---

[35] *See* Doc. 39-1 at 23.
[36] *See* Doc. 45 at 23.
[37] Defendant Olon also argues that this claim is moot, because they produced the monthly adjusted EBITDA calculations in July 2018. *See* Doc. 45 at 23. However, a damages claim is not rendered moot because a related injunctive-relief claim is mooted. *See Ermold v. Davis*, 855 F.3d 715, 719 (6th Cir. 2017).

and IT.[38] The company also had two main "support group" units—quality assurance and product management—supporting all Main Market business divisions.[39]

According to Defendant, the proper way to allocate the general and administrative costs was the "headcount" method. That is, Plaintiff should have allocated these expenses in proportion to the number of employees working in the company chemical division and the other company divisions.[40] Defendant also contends that support group costs should have been apportioned based on chemical division revenue.[41]

Defendant claims that Plaintiff used these methods in its internal financials to allocate the chemical division costs before the sale, and that the total 2016 costs so allocated totaled $2.3 million. Defendant Olon says Main Market intentionally downplayed the chemical division costs to make the chemical division appear more profitable than it actually was.

i) Defendant's 4.5(f) Cost-Allocation Claim

In Purchase Agreement section 4.5(f), Plaintiff warranted that it disclosed—in the attached Purchase Agreement schedule 4.5(f)—all the chemical division operating costs for the twelve-month period ending December 31, 2016.[42] Defendants argue that Plaintiff breached this representation because Main Market failed to include millions of dollars in administrative and support group costs. In schedule 4.5(f), Plaintiff allocated only

---

[38] *See* Doc. 38 at 5.
[39] *Id.* at 3.
[40] *Id.*
[41] *Id.* at 4.
[42] The provision reads in full, "The cost items set out in Schedule 4.5(f) attached hereto (a) represent all or substantially all of the cost items of the Business for the 12-month period ending December 31, 2016; and (b) do not, in the aggregate, materially deviate from the fair market value for the products and services to which such cost items relate, and (c) are sufficient for the operating of the Business as carried out at December 31, 2016."

$498,000 in these costs to the chemical division. Defendant claim that the administrative and support group costs were more than $2 million and Main Market understated actual chemical division costs by nearly $1.8 million.

Plaintiff argues that the figures in schedule 4.5(f) are not inaccurate because they were "pro forma"[43] income statements.[44] That is, Plaintiff argues that the schedule 4.5(f) figures represent the hypothetical 2016 costs of the business operated as a standalone Olon SpA subsidiary, not the actual costs incurred as a Main Market subdivision.[45] And because the assumptions and projections used to arrive at these pro forma estimates were detailed in the Confidential Offering Memorandum,[46] Plaintiff argues that the financial representations were sufficiently accurate and reasonable.

In sum, the parties dispute whether the schedule 4.5(f) representations were meant to be merely broad projections of the chemical division's 2016 costs or whether the 4.5(f) representations were intended as actual chemical division 2016 costs.

The Court finds that there is a material fact dispute regarding Defendant's section 4.5(f) claim. On one hand, section 4.5(f) states that the figures "represent all or substantially all of the cost items of the Business for the 12-month period ending December 31, 2016," suggesting that schedule 4.5(f) was meant to represent the chemical division's actual 2016 costs. On the other hand, the schedule 4.5(f) costs are labeled "Pro Forma FY 2018 income statement" and are described as "estimates" in the offering memorandum.

---

[43] Plaintiff asserts that "pro forma" means "based on financial assumptions." *See* Doc. 49-5 at 6.
[44] *See* Doc. 49-4 at 272.
[45] Plaintiff suggests, for example, that Defendant's new corporate parent would integrate the chemical divisions with its own IT systems, lowering costs. *See* Doc. 49-3 at 4.
[46] *See* Doc. 49-4 at 41 (explaining that "[g]eneral and administrative expense *has been estimated on a pro forma basis*").

Case N0. 1:18-cv-916
Gwin, J.

Viewed in the light most favorable to Plaintiff, this labeling sufficiently raises issues whether the 4.5(f) representations were false.

### ii) Defendant's Section 4.5(g) Cost-Allocation Claim

Similarly, Defendant claims that Plaintiff breached Purchase Agreement section 4.5(g). Section 4.5(g) says that the schedule 4.5(g) cost allocations "fairly represents the allocation of such costs as between the Business and such other business units for said period."[47] Plaintiff argues, as above, that the representations were "pro forma" statements not meant to reflect actual 2016 chemical division cost allocations.

For the same reasons stated above, the Court finds that there is a material factual dispute sufficient to present Defendant's section 4.5(g) claims for trial.

### iii) Defendant's 4.5(b) EBITDA Claim

Finally, Defendant claims that Plaintiff breached Purchase Agreement section 4.5(b), which represents that the financial statements attached to the agreement "fairly present in all material respects the financial condition and results of operations of the Business."[48] Because the financial statement's EBITDA figures incorporate the alleged cost understatements outlined above, Defendant argues that Plaintiff breached this provision.

Because this claim turns on the same material fact dispute at the heart of Defendant's section 4.5(f) and (g) claims, the Court denies summary judgment on this claim.

---

[47] Doc. 39-1 at 30.
[48] Doc. 39-1 at 29.

Case N0. 1:18-cv-916
Gwin, J.

### C. The Court Denies Plaintiff's Summary Judgment Motion on the Purchase Agreement's Indemnity-Cap-and-Basket Provisions

Plaintiff Main Market moves for summary judgment, arguing that the Purchase Agreement's "Cap" and "Basket" indemnity provisions limit its liability for Defendant's counterclaims.

Purchase Agreement section 7.3(a) provides that Plaintiff's liability for breach of representations and warranties in Purchase Agreement Article 4 "shall not exceed 10.0% of the actual Aggregate Purchase Price actually paid by Buyer to Seller (the 'Cap')."[49] Section 7.3(b), in turn, says that Plaintiff has no obligation to indemnify "unless [buyer] shall first have suffered aggregate Indemnifiable Losses in excess of the sum of 1.0% of the actual Aggregate Purchase Price actually paid by Buyer to Seller (the ''Basket'')."[50]

Plaintiff argues that there is no material dispute regarding the Cap and Basket total, and there is no material dispute that it applies to Defendant's Esperion claims.

i) The Cap and Basket Amount

Plaintiff argues that while the total purchase price for the chemical-division sale was $27 million, only $8,387,433 was "actually paid by Buyer to Seller" under section 7.3(a)—the remaining purchase price were Olon's payment of Main Market debts.[51] Thus, Plaintiff Main Market argues that the "Cap" for Defendant's counterclaims is $838,743 and the "Basket" is $83,874.

Defendant argues that the term "aggregate" in "Aggregate Purchase Price" means "whole or total," unambiguously designating the total deal price as the measure for the Cap

---
[49] *Id.* at 44.
[50] *Id.*
[51] *See* Doc. 40-3 at 2-5.

-11-

Case N0. 1:18-cv-916
Gwin, J.

and Basket. It further notes that during contract negotiations, Plaintiff Main Market proposed a $2.7 million Cap, 10% of the total deal amount.[52] Thus, Defendant contends, both the language of the contract and the drafting history suggest that the parties understood the Cap to be 10% of the total deal amount.

While Defendant's drafting-history argument is well-taken, the evidence is not unequivocal. Defendant's interpretation would read the clause "actually paid by Buyer to Seller" out of the contract. Because the contract language does not conclusively demonstrate the parties' intentions, a trial is necessary to resolve this conflict between two plausible readings of the contract.

ii) Applicability of the Cap and Basket to the Esperion Claim

Defendant also opposes Plaintiff's motion, arguing that the Cap and Basket does not apply to its counterclaim against Plaintiff relating to the Esperion settlement. As mentioned above, Defendant Olon had a post-sale contract dispute with Esperion arising from allegedly contaminated chemical inventory acquired with the Purchase Agreement. Defendant subsequently agreed to settle this dispute for $2.25 million.

Plaintiff contends the Esperion claim is subject to the Cap and Basket because it would be a breach of Purchase Agreement section 4.5(e), the warranty that Plaintiff's inventory was "usable and salable in the ordinary course of business."[53]

Defendant argues that this claim is not subject to the Cap and Basket because it does not arise from a breach of the Article 4 warranties and representations.[54] Rather,

---

[52] *See* Doc. 46 at 3; Doc. 46-2 at 47. According to Defendant, they rejected this proposal and adopted a percentage calculation because the earn-out payment might increase the total purchase price.
[53] Doc. 39-1 at 30.
[54] The Cap and Basket apply to indemnification claims under 7.2(a)(i), which include "representations and warranties of the Seller made in ARTICLE 4." *See* Doc. 39-1 at 44.

Case N0. 1:18-cv-916
Gwin, J.

Defendant insists that Sections 7.2(a)(iv) and 7.2(a)(v)—which are not subject to the Cap and Basket—support Olon's Esperion indemnification claim.

Section 7.2(a)(iv) requires Plaintiff to indemnify Defendant for damages resulting from "Excluded Liabilities," liabilities that were not assumed by the seller in the transaction.[55] Under Section 2.4(d), such excluded liabilities include any that "arise[] out of . . . the operation of the Business or the Transferred Assets to the extent any of the foregoing are related to the operation on or prior to the Closing date."[56] Because the alleged contamination resulted from pre-closing business operations, Defendant Olon claims that the Esperion claim is excluded.

Section 7.2(v) requires Plaintiff to indemnify defendant for damages resulting from "any third party claim based upon, resulting from or arising out of the business, operations . . . existing or arising on or prior to the Closing Date."[57] Defendant argues that this provision applies because a third party—Esperion—made the claim and it arises from Plaintiff's pre-sale operations.

Because the Esperion claim falls under three overlapping Purchase Agreement provisions, only one of which is subject to the Cap and Basket, the Court denies Plaintiff's motion for summary judgment on this issue. Given this ambiguity in the contract, more evidence regarding the parties' intent is necessary to resolve this issue.

---

[55] *Id.* at 44.
[56] *Id.* at 18.
[57] *Id.* at 44.

### D. The Court Denies Plaintiff's Motion to Strike Portions of the Oakleson and Newman Declarations

Finally, Plaintiff moves to strike portions of two declarations offered in support of Defendant's summary judgment motion. Because Defendant's summary judgment motion has been resolved in Plaintiff's favor, and because Court's resolution of the motion did not turn on the challenged portions of the declarations, the Court denies the motion to strike as moot.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for summary judgment and **DENIES** Defendant's motion for summary judgment. The Court also **DENIES** Plaintiff's motion to strike.

IT IS SO ORDERED.


Dated: April 9, 2019                       *s/     James S. Gwin*
                                                   JAMES S. GWIN
                                                   UNITED STATES DISTRICT JUDGE